## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ANTHONY C. BAXTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-cv-3198 |
| | ) | |
| ANDREW SAUL, Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Anthony C. Baxter appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Baxter filed a Brief in Support of Motion for Summary Judgment (d/e 10).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 14).  Plaintiff Baxter filed a Reply Brief to Defendant's Motion for Summary Judgment (d/e 15). This matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be affirmed.

## STATEMENT OF FACTS

### Background

Baxter was born on July 31, 1972.  He completed high school and previously worked as a grain elevator worker and a retail maintenance associate.  He last worked on August 6, 2013 and alleged that he became disabled on June 25, 2014 (Onset Date).  Baxter was insured for Disability Benefits through December 31, 2019 (Last Date Insured).  Baxter suffers from chronic obstructive pulmonary disease (COPD), asthma, chronic asthmatic bronchitis, hypersensitivity pneumonitis, degenerative disc disease status post-lumbar surgery, facet arthritis, coronary artery disease, obstructive sleep apnea, and morbid obesity.  R. 14, 17, 25, 66, 266.

### Evidence Before the First Evidentiary Hearing

On January 29, 2014, Baxter saw pulmonologist Dr. David Crabtree, M.D.  R. 543-49.  Baxter saw Dr. Crabtree for a consultation to assess whether he should continue his work at a grain elevator.  He suffered from COPD, asthma, and allergic lung disease and said that he had problems with shortness of breath and coughing.  He had difficulty climbing stairs and inclines.  He reported that his work required him to work in temperatures ranging from -10 degrees to higher than 100 degrees Fahrenheit. He shoveled grain, and used metal grinders, plasma cutters, and acetylene

torches, and was exposed to grain dust, moldy grain, metallic dust, paint fumes, and smoke.  He also had to work at heights.  R. 544-45.  Dr. Crabtree stated, "He has a veritable cornucopia of tasks that he is required to do in his job and most of them are not things that anyone with lung disease should be doing!" R. 545 (exclamation mark in the original).  On examination, Baxter's chest was normal, his respiratory effort was normal, percussion of chest was normal, palpation of chest was normal, and auscultation of lungs was normal. The auscultation of Baxter's heart was normal and his muscle tone was normal.  R. 547-48.

On the same day, January 29, 2014, Dr. Crabtree had Baxter take a pulmonary function test and a chest x-ray.  At the time of the test, Baxter was 71 inches tall and weighed 345 pounds.  The pulmonary function test results indicated no obstructive lung defect, mild restrictive lung defect, moderate decrease in diffusing capacity, and insignificant response to bronchodilator.  R. 558. The x-ray showed mild degenerative changes throughout the thoracic spine with no evidence of acute fracture or subluxation.  R. 553.

On February 13, 2014, Baxter saw Physician's Assistant Nathan DeWitt, PA.  and complained about back pain. R. 593.  On examination, he had normal respiration; normal gait; normal range of motion in his neck,

thoracic spine, and lumbar spine; and no tenderness in the neck, thoracic spine, and lumbar spine.  DeWitt assessed upper back pain, COPD, and morbid obesity.  R. 594.

On February 19, 2014, Baxter saw Dr. Crabtree.  R. 540-43.  Dr. Crabtree stated that Baxter's coughing and shortness of breath were a "reactive process" to triggers in the air at the grain elevator where he formerly worked.  Dr. Crabtree said Baxter was better since he was no longer exposed to those triggers.  R. 540.  On examination, he had decreased breath sounds, diffuse wheezing, and prolonged expiratory time. R. 543.

On May 19, 2014, Baxter saw DeWitt for back pain, lumbago.  R. 589-91.  DeWitt said Baxter had no previous history of back pain.  He reported pain in his lower back that radiated to his left ankle and foot. The pain was continuous and moderate.  He was able to get in and out of bed, feed and clothe himself, and take care of his personal needs.  He also reported some hip pain.  R. 589.  On examination, Baxter had an abnormal gait and tenderness with range of motion of the left lower extremity. He could climb onto the examination table normally and could change positions smoothly.  He had normal range of motion of his neck with no neck tenderness, no muscle weakness, and no decreased muscle tone.  R.

590.  DeWitt assess low back pain (lumbago) and sciatica and recommended resuming regular activities, stretching exercises, and cooling for painful areas.  DeWitt recommended heat therapy before performing prescribed exercises, and prescribed a short course of steroids for the pain and changed Baxter's prescription for muscle relaxants.  R. 590.  DeWitt ordered an x-ray of Baxter's lumbar spine.  R. 591.  The x-ray showed an unremarkable lumbar spine with no fracture, no advanced degenerative changes, and no malalignment.  R. 653.

On June 4, 2014, Baxter saw DeWitt for back pain. He reported back stiffness, back pain, limited movement, and muscle pain.  On examination, Baxter was obese and in no acute distress.  He had an abnormal gait and tenderness on range of motion with the left lower extremity.  He had no neck tenderness, normal range of motion in his neck, no muscle weakness and no decreased muscle tone.  DeWitt assessed sciatica and administered a cortisone injection in the S1 joint of the spine "at the point of greatest pain intensity."  R. 586.  Baxter agreed to begin his stretching and home therapy within the next two days.  R. 586.

On June 30, 2014, Baxter saw DeWitt.  He said the pain was a little better after the June 4 injection. It was worse in the morning.  R. 581.  On examination, Baxter was obese and in no acute distress.  He had an

abnormal gait and tenderness on range of motion of his left lower extremity. He had no neck tenderness and normal range of motion in his neck. He had no muscle weakness and no decreased muscle tone.  DeWitt assessed sciatica and low back pain (lumbago) and ordered physical therapy, a TENS unit, and an MRI.  R. 582.

On July 1, 2014, Baxter went to physical therapy for evaluation and treatment.  He rated his pain as 7/10 in the morning and reported he had back surgery in 2006.  On examination, Baxter's gait was within normal limits and he had no pain on palpation in the lower back.  His flexion of his trunk was limited, and his extension of his trunk was within normal limits. He had pain in movement of his left lower extremity.  Baxter had a positive slump test with his left lower extremity and had decreased sensation to light touch in his left thigh, but otherwise his sensation was intact.  The therapist recommended four weeks of physical therapy, two to three times a week, and issued a home TENS unit to Baxter.  R. 578-79.

On July 2, 2014, Baxter saw Dr. Crabtree.  R. 803-06.  He had an acute exacerbation of his asthma that had been going on for approximately a week. R. 803.  On examination, Baxter had decreased breath sounds diffusely and wheezing. R. 805.  Dr. Crabtree administered a breathing treatment and prescribed a course of prednisone.  R. 803.

On July 7, 2014, Baxter had a lumbar MRI.  The MRI showed a disc prolapse at L5-S1 abutting the thecal sac and left S1 nerve root, correlating with left S1, S2, and S3 radiculopathy; mild central spinal stenosis at L3-L4 and L4-L5; multilevel degenerative disc disease; and no fractures.  R. 652.

On July 21, 2014, Baxter had an x-ray of his lumbar spine.  The x-ray showed no indication of instability on flexion or extension, and no indication of a compression fracture.  R. 651.

On July 22, 2014, Baxter saw Dr. Crabtree.  R. 721-24.  Dr. Crabtree stated that Baxter was "[d]oing really quite well and his PFT [pulmonary function test] was much improved on all aspects of the test. He has been away from work and this has afforded him a significant amount of benefit."  R. 721.  Baxter had a normal pulmonary examination.  R. 724.  Dr. Crabtree stated that Baxter's pulmonary function test and exam were "both as good as I have seen/heard Tony be since I met him. He is doing so much better staying away from the workplace that caused him so many exposures and triggers for his lung issues."  R. 721.  Baxter's pulmonary function test that day showed minimal obstructive lung defect, lung volumes within normal limits, and moderate decrease in diffusing capacity.  R. 556.

On August 28, 2014, Baxter completed a Function Report – Adult form.  R. 283-90.  He lived in a house with his family and on a typical day, he got up and did a breathing treatment with a nebulizer, he ate, used a heating pad until he could move around, and did another breathing treatment. He did a total of four breathing treatments a day and each treatment took 30 minutes.  The treatments made him jittery, but if he missed a treatment, he experienced severe back pain, sweats, and high blood pressure.  He took care of his four-year old daughter after his wife dressed and fed the girl before she left for work.  He had some trouble bathing depending on how his back felt.  He made sandwiches for lunch and made dinner.  It took 30 minutes to do all the cooking each day.  He folded laundry, but he did not do any yard work.  He could not be around chemicals and needed to avoid dust, mold, excessive heat, and excessive cold.  He drove and went grocery shopping by himself once a week for 30 minutes.  He went to the doctor and drug store, but he did not go out otherwise because of his back and his breathing problems.  He watched television and listened to the radio six hours a day.  R. 283-87, 290.  His impairments limited his ability to lift, sit, squat, kneel, bend, reach, stand, walk, climb stairs, concentrate, and use his hands.  He could lift 10 pounds and not walk far.  He had to rest 30 minutes after walking and his

concentration depended on his lungs.  He finished what he started and he could follow instructions and get along with authority figures.  Stress affected his blood pressure.  R. 288-90.

On September 10, 2014, Baxter saw neurosurgeon Dr. Rueben Morris, M.D. On examination, Baxter's motor power of his extremities was normal; he had moderate lumbar tenderness and mild left sciatic notch tenderness; straight leg raising testing was positive on the left and negative on the right; he could stand on his heels and toes, but could not walk on heels or toes due to pain; he had decreased pinprick sensation over the left foot, but proprioception was preserved.  Dr. Morris reviewed the July 7, 2014 MRI and assessed lumbar disc protrusion with sciatica.  Dr. Morris discussed treatment options.  He told Baxter he was at high risk for surgery because of his COPD and evaluation by Baxter's pulmonologist would be required.  R. 668.

On September 16, 2014, Baxter saw his primary care physician Dr. Sebastian Baginski, M.D.  R. 669-70.  Baxter had spinal surgery in 2006 and developed back pain several years later.  He stopped working in the summer of 2013 due to the pain.  He saw a neurosurgeon about the possibility of undergoing another back surgery. He came to Dr. Baginski for a second opinion, "He is essentially wanting my opinion about whether he

should undergo the surgery or have ESI [epidural steroid injections] as I understand the question he is presenting me with today." R. 669. In a review of his symptoms, Baxter said that he was positive for myalgias, back pain, and sensory changes; but that he was negative for dizziness, tremors, focal weakness, seizures, or loss of consciousness. R. 669. On examination, he weighed 360 pounds and had decreased range of motion in his thoracic and lumbar spine with no spasms. He had normal reflexes, no atrophy, and normal muscle tone. During the examination, Dr. Baginski and Baxter "discussed long term plans for pain control including need for weight loss, continued movement/ambulation any formal physical therapy if indicated in the future." R. 670.

On September 23, 2014, Baxter saw Dr. Crabtree. R. 715-20. He had sinusitis and acute exacerbation of his asthma and his chief complaint was shortness of breath. R. 715-16. On examination, Baxter had decreased breath sounds, diffuse wheezing, bibasilar rales and crackles, and prolonged expiratory time. R. 718-19. Dr. Crabtree noted that Baxter saw a neurosurgeon and stated that he believed Baxter was "okay for surgery if needed, but agree that conservative approach is best for now." Dr. Crabtree stated that Baxter's "lungs are a problem." R. 716.

On October 22, 2014, Baxter saw Dr. Crabtree.  R. 679-83.  Dr. Crabtree found that Baxter's asthma and reactive airway disease were stable.  R. 679.  Dr. Crabtree stated that Baxter was doing "exceptionally well."  He had no coughing, wheezing, or chest congestion, and his pulmonary function test had improved.  R. 680.  He had a normal examination.  R. 682.

On January 21, 2015, Baxter saw Dr. Crabtree.  R. 684-88. His chief complaint was shortness of breath, and on examination, Baxter had decreased breath sounds diffusely and prolonged expiratory time.  The rest of the pulmonary examination was normal.  Dr. Crabtree concluded:

> Plan Comments: Very nice young man with a bad situation where he has been having very significant occupational exposures that resulted in occupational asthma and lung disease.  He is not in the environment anymore and has had stability of his lung symptoms, but remains with baseline dyspnea that is likely multifactorial- with his lungs, obesity, and decreased activity levels. Will continue his present regimen and have him back in 4 months with a complete PFT prior to that visit.

R. 684.

On February 19, 2015, Baxter saw state agency physician Dr. Joseph Kozma, M.D., for a consultative examination.  R. 563-68.  Baxter reported that he worked in a grain elevator from 1990 to 2013 and stopped because he was very short of breath.  He said he had an occupational pulmonary

disease due to grain dust at the grain elevator and fumes and smoke from welding.  He previously worked as a welder.  His left leg hurt all the time and his left foot felt numb.  He had spine surgery in 2006 and was told the pain was a sciatic condition.  R. 563.  On examination, Baxter was 69 inches tall and weighed approximately 360 pounds. His lungs were clear, and his breathing was not labored.  He had no tenderness in his chest.  His upper extremities had normal strength with no swelling or tenderness, and he had 5/5 grip strength bilaterally.  His lower extremities had normal muscle tone, no swelling or tenderness, and his lower strength was 5/5. His back had mild tenderness at the lumbosacral junction. His sensory examination was normal, deep tendon reflexes were absent, and he had no abnormal reflexes.  HIs gait was normal, and he could heel and toe walk. He had decreased range of motion in his lumbar spine, and straight leg raising testing was positive at 30 degrees bilaterally.  He had a normal mini-mental status examination and had no difficulty performing fine and gross manipulations.  Dr. Kozma found that Baxter's main problem was shortness of breath on exertion.  He did not show any musculoskeletal weakness.  He had decreased range of motion in his lower extremities.  Dr. Kozma's impression was morbid obesity, chronic low back pain, lumbar

radiculopathy with radiation into the left leg, and bronchospasms due to occupational exposure diagnosed as bronchial asthma.  R. 565-67.

On March 16, 2015, Baxter saw Dr. Morris again and reported that he had a lumbar epidural steroid injection in January.  The injection provided some pain relief, but he still had back pain.  The pain was made worse by prolonged sitting, prolonged standing, twisting, and bending.  He could tolerate sitting or standing for 45 minutes before he had to change positions.  The two men discussed surgical options and the increased risks associated with Baxter's COPD and "body habitus." R. 677.  Baxter made no decision on whether to have surgery.

On March 25, 2015, state agency physician Dr. Sumanta Mitra, M.D., prepared a Physical Residual Functional Capacity Assessment of Baxter. R. 96-98.  Dr. Mitra opined that Baxter could occasionally lift 20 pounds and frequently lift 10 pound; stand and/or walk for four hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally stoop, kneel, crouch, and crawl; frequently balance; and occasionally climb ramps, stairs, ladders, ropes, and scaffolds.  Dr. Mitra further opined that Baxter should also avoid concentrated exposure to humidity, fumes, odors, dust, gases, and poor ventilation.  R. 96-97.

On April 9, 2015, Baxter saw Dr. Crabtree.  R. 778-82.  He had been sick for a month or two with coughing and chest discomfort.  He had a course of antibiotics, but he was not completely over the illness.  R. 779. On examination, Baxter was wheezing but his pulmonary exam was otherwise normal.  R. 781.  Dr. Crabtree prescribed an antibiotic and a steroid.  R. 779.

On April 13, 2015, Baxter completed another Function Report – Adult form.  R. 312-19.  He lived with his wife and four children in a mobile home. When he got up in the morning, he did a breathing treatment and took pain medication for his back.  His wife helped him when he got up and helped him put on his socks and shoes.  She also got the four children dressed and fed. Three of the children went to school and Baxter took care of the youngest, a four-year old daughter.  He made sandwiches or other simple meals each day.  He spent about 15 minutes a day preparing meals and folded laundry twice a day for 15 minutes.  He drove a car and went out alone.  Once a week he went out for 30 minutes to the pharmacy or the grocery.  He spent time each day watching baseball on television.  R. 312-17.  His impairments limited his ability to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs.  He could lift 10 pounds and walk one block, after which he had to rest for 15 minutes. He could concentrate for

an hour.  He finished what he started, followed instructions, and got along
with authority figures.  He did not sleep well because of the back pain and
breathing problems and his breathing treatments made him shaky.  R. 313-
18.

On April 27, 2015, Baxter saw Dr. Morris.  He reported that he
continued to have left leg pain and felt like he dragged his left foot
sometimes.  His gait was normal at the office visit and he did not walk with
a limp.  The two men discussed surgical options, but Baxter did not make a
decision.  R. 865.

On June 1, 2015, Baxter saw Dr. Crabtree for a recheck of his
breathing issues.  R. 695-98.  Dr. Crabtree stated, "Chuck is really doing
quite well - no acute issues. He is much better as he is no longer exposed
to the agents at his work place."  R. 695.  On examination, Baxter had
decreased breath sounds, but otherwise, a normal pulmonary examination.
R. 698.

On June 13, 2015, Baxter went to an emergency room with right ear
pain.  He reported right ear pain for the last two days.  The night before he
noticed drainage coming out his right ear.  Baxter said he did "lots of
swimming" before the pain started two days earlier.  The emergency room

physician assessed a right otitis media with a perforated tympanic membrane. He received a prescription for antibiotics.  R. 745.

On July 20, 2015, state agency physician Dr. Richard Bilinsky, M.D., prepared a Physical Residual Functional Capacity Assessment of Baxter. R. 112-14.  Dr. Bilinsky opined that Baxter could occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally stoop, kneel, crouch, and crawl; frequently balance; occasionally climb ramps and stairs; and never climb ladders, scaffolds, and ropes.  Dr. Bilinsky also opined that Baxter should avoid concentrated exposure to humidity, fumes, odors, gases, dust, and poor ventilation.  R. 112-13.

On August 4, 2015, Baxter saw neurosurgeon Dr. Mark Gold, M.D. R. 871-73.  Baxter reported that 90 percent of his pain was left leg pain and 10 percent was low back pain.  The leg pain radiated from his buttocks down his left leg to his left ankle.  He occasionally had pain that radiated down his right leg.  R. 871.  On examination, Baxter was 5 feet 11 inches tall, weighed 360 pounds, and had a body mass index (BMI) of 50.23.  His lower extremities muscles had 5/5 strength, except his left Gastrocnemius and Soleus muscles in his left calf had 4/5 strength.  Dr. Gold noted that Baxter was unable to stand on his left toes in isolation.  His sensory

function was intact except for decreased sensation over the lateral aspect of the left foot.  Straight leg raising tests were negative on the right and positive on the left.  Dr. Gold assessed left S1 lumbosacral radiculopathy, likely secondary to large left L5-S1 disc herniation.  Dr. Gold ordered an updated MRI of Baxter's lumbar spine.  R. 872-73.

On August 17, 2015, Baxter had an MRI of his lumbar spine.  The MRI showed increased prominence of the left side disc protrusion at L5-S1 and minimal stenosis at L3-L4 and L4-L5.  R. 939.

On August 18, 2015, Baxter saw Dr. Gold for a follow up.  He stated that he was in "a lot of pain."  R. 875.  The low back pain and leg pain were now about equal.  Dr. Gold found that the MRI showed a large left disc herniation at L5-S1 and that the herniation had increased since the 2014 MRI.  Dr. Gold told Baxter that he could live with the pain or have surgery. Dr. Gold said that he had a significantly increased risk of complications from the surgery because he was morbidly obese, including wound infection, deep vein thrombosis, and persistent lower back pain.  Dr. Gold mentioned the option of conservative therapy combined with significant weight loss, greater than100 pounds, before undergoing surgery.  R. 876.

On September 4, 2015, Baxter took a six minute walking test.  The test showed that he was able to walk six minutes.  He showed severe to

very severe exertion in performing the test.  His blood oxygen level was 97 percent at rest before the test and ranged from 91 to 98 during the test, and his pulse was 85 at rest before the test and ranged from 97 to 104 during the test.  R. 822-23.

On September 22, 2015, Baxter saw Dr. Gold again.  R. 878-80.  Dr. Gold's examination findings were substantially similar to the findings from the August 4, 2015 examination.  Baxter and his wife chose the option of trying a weight-loss program with exercise, if Baxter could tolerate the exercise.  Dr. Gold stated this was "a very reasonable approach" and referred Baxter to Baxter's primary care physician Dr. Baginski for a weight loss program and physical therapy.  Dr. Gold noted that if Baxter could not tolerate the exercise program due to his pain, he might need surgery first. R. 880.

On September 29, 2015, Baxter saw a physical therapist for evaluation.  He completed a Disability Questionnaire and stated on the form that: he had moderate pain at the time; he could sit for 30 minutes before he had to move due to the pain; he could take care of his personal care, but with increased pain; he got less than six hours of sleep a night due to the pain; his pain prevented him from lifting heavy weights, but he could lift medium to light weights if conveniently placed; he could not walk

more than 500 meters due to the pain; and he could not travel for more than an hour.  R. 844.

On November 18, 2015, Baxter saw Dr. Gold.  R. 887-89.  He said that he missed physical therapy sessions because of an exacerbation of his bronchitis.  R. 887.  On examination, Baxter weighed 380 pounds and had a BMI of 53.02.  Otherwise, Dr. Gold's examination of  Baxter remained substantially unchanged from his August 4, 2015 examination.  R. 888.  Dr. Gold told Baxter to return to physical therapy and to his weight loss plan under the care of Dr. Baginski as soon as his bronchitis improved sufficiently to allow him to do so.  R. 888.

On November 20, 2015, Baxter saw Dr. Crabtree for his acute breathing problems.  R. 760-64.  He had gotten sick three weeks earlier and had just completed a course of antibiotics and steroids.  R. 761.  On examination, Baxter was wheezing.  R. 763.  Dr. Crabtree administered an hour-long treatment of a bronchodilator through a nebulizer.  R. 761.

On January 19, 2016, Baxter saw Dr. Gold.  R. 890-91.  He reported that he discontinued his physical therapy due to excessive coughing.  His condition improved but he still had increased low back pain and pain down his left lower extremity.  The examination results were substantially the same as the November 18, 2015 exam.  R. 891.  Baxter told Dr. Gold that

his condition was not worse.  Dr. Gold found that Baxter was coping well

with his symptoms and recommended continuing Baxter's weight loss

program with Dr. Baginski and continued conservative treatment,

> Since the patient is coping well with his symptoms and has not
> had any progression of neurological deficits, I did recommend
> continuing with conservative or nonsurgical management.  He
> will continue to work on weight loss and improving functionality
> as much as he is able to.  He will follow up . . . in 2-3 months, or
> sooner if necessary.

R. 891-92.

On January 22, 2016, Baxter saw Dr. Crabtree.  R. 755-59.  Dr.

Crabtree stated that Baxter was doing "exceptionally well."  Baxter had no

acute issues or complaints.  R. 756.  On examination, he had marked

decreased breath sounds, but otherwise a normal pulmonary exam.  R.

758.  A six minute walking test showed that he was able to walk six

minutes.  He showed somewhat severe exertion in performing the test.  His

blood oxygen level was 97 percent at rest before the test and ranged from

96 to 99 during the test, and his pulse was 85 at rest before the test and

ranged from 94 to 101 during the test.  R. 814-16.

On May 10, 2016, Baxter saw Dr. Gold.  R. 903-04.  He reported that

he was about the same as the last visit.  The pain waxed and waned and

he had no new symptoms.  R. 903.  On examination, Baxter weighed 384

pounds.  Baxter's lower extremity muscles had 5/5 strength except the left

gastrocnemius and soleus muscles in his left calf had 4/5 strength.  Straight

leg raising testing was negative bilaterally.  He had intact sensation except

for reduced sensation over the lateral aspect of the left foot.  R. 904.  Dr.

Gold recommended continuing conservative nonsurgical therapy and said

Baxter was doing well with this approach.  R. 904.

On July 8, 2016, Baxter saw Dr. Baginski with complaints of

depression and anxiety.  R. 906-12.  Dr. Baginski described Baxter as

follows:

> He has several chronic and quite physically debilitating
> conditions - morbidly obese with OSA [obstructive sleep apnea]
> on CPAP [continuous positive airway pressure], has COPD,
> sleeps poorly, has testosterone deficiency (not treated), chronic
> back pain for which he is not a surgical candidate (see below) –
> he is currently unemployed and awaiting disability
> determination - 2 years for back problems and respiratory
> issues.

R. 907.  On examination, Baxter weighed 366 pounds and he had a

depressed mood, but an otherwise normal mental status examination.  Dr.

Baginski prescribed Celexa and recommended lifestyle changes that

included weight loss, exercise, regular sleep, and mental health counseling.

R. 911.

On August 24, 2016, Baxter saw Dr. Baginski.  R. 924-29.  Baxter

recently had hernia repair surgery and stated that his back pain was much

better while he was taking the Percocet (oxycodone and acetaminophen)

prescribed after the surgery.  R. 925.  On examination, Baxter weighed 340
pounds.  He had decreased range of motion and pain in his thoracic and
lumbar spine.  He had normal reflexes and normal coordination.  Dr.
Baginski encouraged Baxter to continue his weight loss and increased the
dosage of the Celexa prescription and prescribed Percocet to be taken
sparingly for pain.  R. 928.

On November 2, 2016, Baxter saw Dr. Baginski for a medication
check.  R. 954-60.  HIs mood was better since he started taking the
Celexa, but he still had some anxiety and depressed mood.  R. 955.
Baxter's COPD was stable, and he was compliant with his COPD
medication regimen.  R. 958.  On examination, Baxter weighed 335 pounds
and he had decreased range of motion and pain in his thoracic and lumbar
spine.  His mood was anxious, but his speech, behavior, memory,
judgment, cognition, and thought content were all normal.  He was not
hallucinating, and he was attentive.  R. 957-58.  Dr. Baginski increased the
dosage of the Celexa and continued the prescription for Percocet.  R. 958.

On November 30, 2016, Baxter saw Dr. Gold.  R. 961-63.  He had
lost 60 pounds and said his back pain was about the same.  Dr. Gold noted
that Baxter's symptoms had not changed since August 2015.  R. 961.  On
examination, Baxter weighed 320 pounds and had a BMI of 48.67.  Dr.

Gold assessed post lumbar laminectomy syndrome.  Baxter had a lumbar

laminectomy surgery in 2006.  See R. 667, 669.  Dr. Gold recommended

that Baxter return on an as-needed basis.  Baxter asked Dr. Gold to fill out

a form for Baxter's application for Disability Benefits.  Dr. Gold declined:

> Follow up on an as-needed basis. Patient did request that I
> complete a disability questionnaire for his application for Social
> Security disability. I recommended he have his primary care
> physician complete this, since I am only following him for his
> post lumbar laminectomy syndrome. From a neurosurgical
> standpoint, the patient would be able to return to work as long
> as he was careful not to aggravate his back.

R. 962.

On December 1, 2016, Baxter saw his pulmonologist Dr. Crabtree.

R. 970-73.  Dr. Crabtree ordered a six-minute walking test and a pulmonary

function test.  The six-minute walking test showed that Baxter was able to

walk six minutes.  He showed moderate exertion in performing the test.  His

blood oxygen level was 97 percent at rest before the test and ranged from

97 to 99 during the test, and his pulse was 64 at rest before the test and

ranged from 74 to 80 during the test.  R. 1026-27.  The pulmonary function

test showed mild obstructive lung defect, lung volumes within normal limits,

mild decrease in diffusing capacity, and insignificant response to

bronchodilator.  R. 1025.

On December 12, 2016, Baxter saw Dr. Baginski.  R. 964-69.  Baxter gave Dr. Baginski the first two pages of a four-page Medical Source Statement Form for his application for Disability Benefits.  Baxter had provided the last pages to his pulmonologist Dr. Crabtree.  R. 964.  Baxter told Dr. Baginski that he could not work because of his back pain. R. 965.  On examination, Baxter weighed 323 pounds and was morbidly obese.  He had decreased range of motion and pain in his thoracic and lumbar spine.  He had no atrophy, normal reflexes, normal muscle tone, and normal coordination.  R. 967-68.  Dr. Baginski completed the two pages of the Medical Source Statement.  Dr. Baginski stated, "The patient certainly does have limitations as to the range of motion and ability to function in a workplace capacity. See the details of the forms for any further clarification."  R. 968.

On December 4, 12, and 13, 2016, Drs. Baginski and Crabtree completed the Medical Source Statement Form.  R. 943-46, 974-78.[1]  Dr. Baginski opined that Baxter could lift 20 pounds occasionally and 10 pounds frequently, sit for less than two hours in an eight-hour workday, and stand and walk for less than two hours in an eight-hour workday.  R. 974.

---

[1] Dr. Crabtree signed on December 4, 2016.  Dr. Baginski initialed parts of the form on December 12, 2016 and signed on behalf of Dr. Crabtree on December 13, 2016.  R. 943-46, 974-78.

Dr. Baginski opined that Baxter needed to change positions every 15 minutes and walk around every 20 minutes, each time walking for five minutes.  He had to be able to change positions at will from sitting to standing or walking, and he had to be able to lie down twice a day during the workday.  Dr. Baginski said that Baxter could occasionally twist and climb stairs, but could never stoop, crouch, or climb ladders.  He said that Baxter could frequently reach, handle, finger, and feel, and could occasionally push and pull.  He stated the basis for these opinions as chronic pain, displacement of left lumbar spine disc, and left lumbar radiculopathy.  R. 974-76.  Dr. Crabtree opined that Baxter should avoid moderate exposure to extreme cold and all exposure to extreme heat, high humidity, dust, gases, fumes, odors, perfumes, soldering fluxes, solvents, cleaners, chemicals, and allergens wood dust and grasses.  Dr. Crabtree based these opinions on results of pulmonary function tests (PFTs) that he said showed severe asthma and chronic bronchitis.  He further opined that Baxter would miss work more than four days a month and would need to take unscheduled breaks during the workday and further stated that Baxter would be off-task while at work zero percent of the time.  R. 977-78.

<u>The First Evidentiary Hearing</u>

On January 19, 2017, the Administrative Law Judge (ALJ) conducted an evidentiary hearing. R. 61-90. Baxter appeared with his attorney. R. 63. Baxter testified at this hearing. He was separated from his wife and lived in an apartment by himself. He was 5 feet 11 inches tall and weighed 320 pounds. He had lost 60 pounds since June 2014. R. 68-69.

Baxter reported that he experienced shortness of breath three to four times a day and experienced chest pain whenever he had shortness of breath. The pain lasted for 15 minutes each time. He used a nebulizer every four to five hours for shortness of breath and said that the nebulizer breathing treatments made him dizzy. The dizziness lasted for an hour after a treatment. Baxter also took Singular and Symbicort for his breathing. He took one Singular pill a day and inhaled two puffs of Symbicort, twice a day. R. 70-73.

Baxter's back problems caused pain in his legs. He described the pain as burning and numbness, and also sharp pains. R. 74. He also had low back pain that went down into both his legs. The left was worse than the right and the pain radiated all the way to his toes. He said he had the pain constantly, and it worsened three to four times a day. R. 74-75. In the episodes of bad pain, the pain radiated down both legs and lasted an hour

each time.  R. 76.  The pain interfered with his sleep. He went to bed about 11:00 p.m., but often did not fall asleep until 1:00 a.m. or 2:00 a.m. and woke up four to five times a night.  R. 82.

Baxter's left foot was numb all the time.  He said the foot had been numb for a year and caused trouble walking when the numbness was bad. His left leg would become weak and give out and he caught his left foot on objects.  He testified that he stumbled twice a week due to the numbness, but he had not fallen.  R. 77.

Baxter took oxycodone for his pain.  He previously took hydrocodone, but it was not effective.  The oxycodone dulled the pain.  R. 75-76. The oxycodone made him sleepy.  R. 80.  He also tried heating pads and a TENS unit to relieve his back and leg pain, as well as physical therapy, but the therapy made the pain worse.  R. 78.

Baxter stated that on a typical day from 9:00 am to 5:00 pm, he would lie down for a total of four hours.  He could go about two hours without having to lie down.  Sometimes he would lie down because of the side effects from the nebulizer and sometimes he would lie down because of back pain.  When he would lie down for back pain, he would stay down for 45 minutes.  R. 78, 88-89.  He took naps every day for an hour.  R. 79. He estimated that he could walk a block and then would need to sit and rest for

half an hour.  R. 73.  His two older children swept his apartment and
cleaned his bathroom for him.  R. 81.  His ex-wife did his laundry for a time,
but recently stopped.  He planned to have his children help him go to the
laundromat to do his laundry.  R. 86.  He attended some of his children's
school activities.  R. 87.  He stopped going to church because he could not
sit in the church pews because of his pain.  R. 86.

Baxter stated that he could sit for 10 to 15 minutes and stand for 10
to 15 minutes at a time. R. 83.  The heaviest weight he could lift without
pain was 10 pounds.  R. 84.

Baxter drove once a week to go grocery shopping.  He could not
drive immediately after using the nebulizer because of the dizziness.  He
could walk for about 20 minutes while shopping before he needed to sit
down.  When he got home from shopping, he would lie down for an hour.
R. 81.  He also left his apartment to go to the pharmacy, the doctor, and to
his ex-wife's house to get his children and to visit with his children.  R. 86.
He drove 35 to 40 minutes to get to the hearing and stopped once during
the drive to get out and stand up.  R. 87-88.  The ALJ then concluded the
hearing.

Evidence after the First Evidentiary Hearing

On June 20, 2017, Baxter saw Dr. Crabtree.  R. 1001-04.  Dr. Crabtree stated that Baxter was "doing well on all fronts with coughing wheezing, and congestion."  R. 1001.  On examination, Dr. Crabtree noted a wheeze, but otherwise Baxter had a normal pulmonary exam.  R. 1004.

On November 28, 2017, Baxter saw Dr. Baginski.  R. 1046-56. Baxter complained of fatigue and shortness of breath.  He was now divorced and picked up his children after school every day.  R. 1047.  On examination, Baxter weighed 368 pounds.  R. 1050.  He was morbidly obese.  He exerted normal effort to breathe but exhibited decreased breath sounds.  He had decreased range of motion and pain in his thoracic and lumbar spine.  He had normal reflexes, muscle tone, and coordination.  His mood was anxious.  He had normal speech, behavior, judgment, thought content, cognition, and memory.  R. 1052.  Dr. Baxter assessed uncontrolled episodes of daytime somnolence.   R. 1053.  Dr. Baginski told Baxter to lose weight and also stated that Baxter should have an overnight pulse oximetry test.  R. 1052.

On January 4, 2018, Baxter saw Physician's Assistant Kristina Sampson, PA-C, in Dr. Baginski's office.  R. 1057-60.  Baxter complained of an upper respiratory infection.  He had fever, body aches, headaches,

cough, chest discomfort, shortness of breath, and nasal congestion.  R. 1060.  On examination, Baxter's ear canals were swollen and red.  His breathing exhibited normal effort and normal breath sounds.  R. 1060.  Sampson assessed influenza A, acute swimmer's ear both sides, and fever and prescribed Tamiflu and ear drops.  She told Baxter to keep his ears dry, continue his nebulizer treatments, and take Mucinex.  R. 1060.

On January 9, 2018, Baxter saw Dr. Crabtree R. 994-1000.  He had cold symptoms, including coughing and wheezing.  R. 996.  On examination, he was wheezing.  Dr. Crabtree administered an hour-long breathing treatment through a nebulizer.  R. 995-96.

On February 8, 2018, Baxter saw Dr. Crabtree.  R. 989-93.  His breathing was stable.  R. 990.  On examination, he had decreased breath sounds, but otherwise a normal pulmonary exam.  R. 992.  His six-minute walking test showed that he was able to walk six minutes.  His blood oxygen level was 98 percent at rest before the test and ranged from 96 to 99 during the test, and his pulse was 100 at rest before the test and ranged from 98 to 103 during the test.  The person administering the test did not indicate his level of exertion during the test.  R. 1018-19.

On February 28, 2018, Baxter saw Dr. Baginski.  He was compliant with using his CPAP machine and had significant improvement in daytime

somnolence and alertness.  R. 1080.  On examination, he weighed 372 pounds.  He exerted normal effort to breathe but exhibited decreased breath sounds.  He had decreased range of motion and pain in his thoracic and lumbar spine.  He had normal reflexes, muscle tone, and coordination. He had normal speech, behavior, judgment, thought content, cognition, and memory.  His mood was not anxious.  R. 1083.

On May 15, 2018, Baxter saw Dr. Gold's nurse practitioner Anita Arnold NP.  R. 1040-41.  He reported increased pain in his lower back that radiated down his left leg and swelling in the left leg.  On examination, he had lumbar tightness without spasms, his gait was steady, and he had 5/5 strength in all his extremities.  Arnold stated in her plan:

> PLAN: At this time patient is functionally intact. Patient's medications will be changed, Gabapentin will be increased to 300 mg 3 times a day. Patient will follow-up in 3 weeks for reevaluation. The patient has a change in condition strength or function habits the patient sooner.

R. 1041.  Dr. Gold signed the medical report as the collaborating physician for the encounter.  R. 1042.

On June 20, 2018, Baxter saw nurse practitioner Arnold again for increased low back and leg pain.  He reported occasional leg weakness and that the pain went from 3 or 4 out of 10 to 6 out of 10 by the end of the day.  He said the gabapentin provided significant improvement.  R. 1145.

On examination, his gait was steady, but he favored his left side. He had

4+/5 strength in his left leg. Arnold noted moderate neuropathic pain. He

said he was feeling somewhat worse. Arnold increased the gabapentin

dosage and scheduled an MRI. R. 1046. Dr. Gold signed as the

collaborating physician on this encounter. R. 1047.

THE SECOND EVIDENTIARY HEARING

On July 18, 2018, the ALJ conducted a second evidentiary hearing in

this case. R. 35-60. Baxter appeared with his attorney. Vocational expert

Theresa Wolford and medical expert Dr. Arnold Ostrow, M.D., also

appeared. R. 37.[2]

Dr. Ostrow testified first. Dr. Ostrow was board-certified in internal

and a sub-specialty in pulmonary medicine. R. 39. He reviewed Baxter's

medical records and stated that Baxter had asthma and COPD. Dr. Ostrow

opined that Baxter's impairments due to asthma and COPD did not meet or

equal the Social Security Administration's listings of respiratory

impairments, 20 C.F.R. Part 404, Subpart P, Appendix1, (Listings), Listings

3.02 and 3.03. R. 40.

The ALJ asked Dr. Ostrow about Baxter's use of a nebulizer. Dr.

Ostrow stated that individuals used nebulizers for short-term relief of

---

[2] The court reporter spelled Dr. Ostrow's name phonetically as Dr. Astro in the transcript of the hearing.

respiratory symptoms and said that dizziness would be an unusual side-effect from using a nebulizer.  The only side-effect was that the benefits from nebulizers "dissipates rather quickly."  R. 40.

Dr. Ostrow listed all of Baxter's medically determinable impairments. He opined none of his impairments or combination of impairments met or equaled any of the impairments described in the Listings.  R. 41.

Dr. Ostrow further opined that, based on the objective medical evidence in Baxter's medical record,  Baxter could lift 20 pounds occasionally and 10 pounds frequently; sit for six hours in an eight-hour workday; stand and walk for six hours\ in an eight-hour workday; could not stretch his upper extremities; could occasionally use foot pedals; occasionally engage in postural maneuvers such as crouching, crawling, stooping, kneeling, and balancing; occasionally climb stairs and ramps; never climb ladders, ropes, or scaffolds; and never work at unprotected heights.  Dr. Ostrow also opined that Baxter must have no concentrated exposure to air pollution and excessive temperature changes, and should avoid working with dangerous machinery.  R. 42.

Baxter's attorney asked for the basis of his opinions on Baxter's functional limitations.  Dr. Ostrow said the entire medical files supported his opinion.  Dr. Ostrow explained:

A   Well, the pulmonary function studies were perfectly normal. There was no evidence in the records at all of any neurologic contaminant, either with the Monocylcodiscogenic disease objectively. There's no atrophy of muscles, there's no stipulations [PHONETIC], there's no signs of weakness, and no significant limitations. I don't know what -- that -- that's it.

R. 45.[3]

Baxter's attorney asked Dr. Ostrow about a July 22, 2014 pulmonary function test.[4]  Dr. Ostrow said the test was normal. The attorney asked Dr. Ostrow about asthma and pulmonary function tests.  Dr. Ostrow said that asthma was an episodic condition in which the person sometimes had symptoms.  As a result, pulmonary functions tests would not detect asthma if the person was not having symptoms at the time of the test.  R. 43. Dr. Ostrow said that a normal pulmonary function test would not rule out asthma.  He said that COPD was made up of two illnesses, emphysema and chronic bronchitis and that Baxter's normal pulmonary function test could rule out a diagnosis of chronic bronchitis.  R. 44.  Dr. Ostrow would not opine on the effects of Baxter's subjective pain symptoms because he did not examine Baxter.  R. 46.

The attorney asked Dr. Ostrow about Dr. Baginski's statement in the December 2014 Medical Source Statement that Baxter had displacement

---

[3] Dr. Ostrow referred to Baxter's spinal impairment as Monocylcodiscogenic disease.  R. 41, 45.
[4] The attorney cited to the Commission's exhibit number and page as 28-F5, or R. 555.  The pulmonary function test results were on R. 556.

of a lumbar spine disc.  Dr. Ostrow said that the medical records did support that statement.  Baxter had degenerative disc disease but not a displacement of a lumbar disc.  R. 46-47.  Dr. Ostrow said that he could not comment on the diagnosis of radiculopathy without examining Baxter. He said that he would order an EMG nerve conduction study to support a diagnosis of radiculopathy and he saw no such study in the records.  R. 47-48.

Baxter then testified and said he was dizzy every time he used the nebulizer for a breathing treatment.  The dizziness lasted for 30 minutes. R. 50. The benefits of the nebulizer lasted for about 45 minutes.  R. 51.  He had shortness of breath two to three times a day and still experienced chest pains on bad days.  R. 52.  Baxter's doctors changed his pain medication.  He took gabapentin and ibuprofen as his primary pain medications and much less oxycodone.  He did not want to get addicted. R. 51-52.  His use of the nebulizer had not changed since the first hearing. R. 52.

Baxter had no change in his back and leg pain since the first hearing, no change in the numbness in his foot, and no change in his habit of taking naps during the day.  R. 52-54.

Vocational expert Theresa Wolford then testified.  The ALJ asked

Wolford the following hypothetical question:

> If you would please consider a hypothetical individual 46
> years of age, high school education, no relevant past work. For
> purposes of the hypothetical, please assume they would be
> able to lift or carry 20 pounds occasionally, 10 pounds
> frequently; for standing and walking, it would be two hours of an
> eight-hour day; for sitting it would be six hours of an eight-hour
> day; with no climbing, occasional stooping, no kneeling,
> crouching or crawling.
>
> Assume the hypothetical individual would be able to
> frequently reach, handle and finger; would need to avoid work
> environments of extreme heat or cold; would need to avoid
> concentrated exposure to smoke, fumes, dust, gasses; avoid
> hazards such as dangerous machinery and unprotected
> heights.
> . . . .
> And if you will tell us, please, in your opinion, would the
> hypothetical individual described be able to perform any
> unskilled occupations in the national economy?

R. 56-57. Wolford opined that such a person could perform sedentary jobs

such as final assembler, with 229,240 such jobs in the national economy;

charge account clerk, with 204,730 such jobs in the national economy; and

document preparer, with 97,252 such jobs in the national economy. R. 57.

None of these jobs involved pushing or pulling.  R. 59.

Wolford opined that the person in the ALJ's hypothetical question

could not work if the person's limitations were changed in any of the

following ways:  the person could not sit, stand, and walk for a total of eight

hours in an eight-hour workday; the person had to walk around 20 times in an eight-hour workday, each time for five minutes; or the person needed to lie down twice a day at times other than the lunch period or scheduled break periods during the workday.  Wolford opined that a person could not work if he consistently had to miss work two days a month.  R. 59.  The person in the ALJ's hypothetical could work if the person had to change positions every 15 minutes.  R. 58.

The ALJ then concluded the hearing.  R. 60.

## THE DECISION OF THE ALJ

On August 13, 2018, the ALJ issued his decision. R. 14-27.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's impairments or combination of impairments must meet or be equal to the criteria of one of the Listings.

20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Baxter met his burden at Steps 1 and 2.  Baxter had not engaged in substantial gainful activity since his Onset Date, and he suffered from the severe impairments of COPD, asthma, chronic asthmatic bronchitis, hypersensitivity pneumonitis, degenerative disc disease status post-lumbar surgery, facet arthritis, coronary artery disease, obstructive

sleep apnea, and morbid obesity.  R. 16-17.  The ALJ determined at Step 3

that Baxter's impairments or combination of impairments did not meet or

equal a Listing.  R. 18-19.

Before considering Step 4, the ALJ determined that Baxter had the

following RFC:

> 5.    After careful consideration of the entire record, the
> undersigned finds that the claimant has the residual functional
> capacity to perform light work as defined in 20 CFR
> 404.1567(b) except he can lift or carry 20 pounds occasionally
> and 10 pounds frequently, stand and/or walk 6 hours out of an
> 8-hour workday, and sit 6 hours in an 8-hour workday. He
> cannot climb, kneel, crouch, or crawl, but can occasionally
> stoop.  He can frequently reach, handle, and finger.  He must
> avoid work environments of extreme heat or cold; avoid
> concentrated exposure to smoke, fumes, dust, and gases; and
> avoid hazards such as dangerous machinery and unprotected
> heights.

R. 19.

The ALJ based his RFC finding on the pulmonary function tests that

showed only mild to moderate breathing problems; six-minute walking tests

that were negative with 91 to 99 percent oxygen saturation on room air;  Dr.

Crabtree's statements in his medical examination records that Baxter was

better once he got away from the fumes, dusts, and other irritants that were

present at his prior work; the imaging of Baxter's back that showed

degenerative disc disease but "were not suggestive of significant functional

deficits;" examinations that showed normal or near normal strength, normal

dexterity, intact sensation except for over the left foot, normal coordination, and a normal or stable gait; Dr. Gold's recommendation of conservative treatment of Baxter's back impairments; the November 30, 2016 statement by Dr. Gold that from a neurosurgical standpoint Baxter could work if he was careful not to aggravate his back; the opinions of Drs. Ostrow, Mitra, and Bilinsky; and the May 2018 statement by nurse practitioner Arnold that Baxter was functionally intact.  R. 19-25.

The ALJ found that Baxter's testimony at the evidentiary hearings about his limitations was inconsistent with other evidence in the record. The ALJ noted inconsistencies with his statements in the record, including statements that he picked his children up from school every day, he could lift medium to light weights if conveniently placed, he did "'lots of swimming,'" and he watched his four-year old daughter during the day.  R. 22.  The ALJ also found his testimony about his limited ability to walk was inconsistent with the negative six-minute walking tests.  R. 23.

The ALJ gave little weight to the December 2016 Medical Source Statement of Drs. Baginski and Crabtree.  The ALJ found that the opinions were not consistent with the findings in the medical records and were inconsistent with Baxter's statements regarding his daily activities, such as

preparing meals, caring for his four children, shopping weekly, and attending some of his children's school activities.  R. 24.

At Step 4, the ALJ found that Baxter could not perform his prior work. R. 25.  At Step 5, the ALJ found that Baxter could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. 404, Subpart P, Appendix 2, and Wolford's opinions that a person with Baxter's age, education, experience, and RFC could perform the representative jobs of final assembler, charge account clerk, and document preparer.  The ALJ concluded that Baxter was not disabled.  R. 25-26.

Baxter appealed the ALJ's decision.  On June 20, 2019, the Appeals Council denied Baxter's request for review.  The ALJ's decision then became the final decision of the Defendant Commissioner.  R. 1.  Baxter then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial

evidence, and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of

symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social

Security Administration no longer uses the term credibility in the evaluation

of statements regarding symptoms).  The ALJ must articulate at least

minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,

872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The RFC

finding that Baxter could work if he avoided temperature extremes and

dust, fumes, etc., was supported by Dr. Ostrow's review of the pulmonary

function test results and by Dr. Crabtree's findings that Baxter was

significantly better once he left the grain elevator's dust and other irritants.

The exertional limitations in the RFC were supported by:  (1) the medical

examination records that showed negative six minute walk tests, no
atrophy, no spasms, intact sensation except for over part of the left foot,
normal or near normal strength in the lower extremities, normal or stable
gait, normal dexterity, normal strength in the upper extremities; (2) Dr.
Gold's statement that from a neurosurgical standpoint Baxter could work if
he was careful not to aggravate his back; (3) and the opinions of Drs.
Ostrow, Mitra, and Bilinsky.  The ALJ's findings that Baxter made
inconsistent statements about the severity of his symptoms was supported
by Baxter's statements in the record, including statements that: he could lift
medium to light weights if conveniently placed, he watched his four-year old
child during the day, he picked up his children every day from school, and
he did "lots of swimming."

The RFC finding and Wolford's opinions supported the ALJ's decision
at Step 5 that Baxter could perform a significant number of jobs in the
national economy.  The ALJ's decision was supported by substantial
evidence.

Baxter argues that the ALJ erred in failing to give controlling weight to
the December 2016 Medical Source Statement of Drs. Baginski and
Crabtree.  The ALJ must give the opinions of a treating physician
controlling weight if the opinions are supported by objective evidence and

are not inconsistent with other evidence in the record. 20 C.F.R. §

404.1527(d)(2); <u>Bauer v. Astrue</u>, 532 F.3d 606, 608 (7th Cir. 2008).[5]  In this

case, substantial evidence supported the ALJ's decision not to give

controlling weight to these opinions.  The ALJ identified medical

examination records and tests discussed above that showed normal or

near normal strength, sensation, stance, gait, and dexterity.  The ALJ also

identified pulmonary function tests and six minute walking tests that were

inconsistent with the opinions of these doctors.  The ALJ also noted that

the expert in the field, neurosurgeon Dr. Gold, recommended only

conservative treatment and Baxter was stable on that treatment.  The ALJ

further noted that these opinions were inconsistent with Baxter's

statements that he cooked meals, took care of his four-year old daughter,

shopped weekly, and attended some of his children's activities.  The ALJ

also gave weight to some of the opinions by limiting Baxter to no exposure

to extreme temperatures, gases, fumes, dust, etc.  R. 24.  This evidence

provided substantial evidence that the opinions in the Medical Source

Statement was not supported by objective medical evidence in the record

---

[5] The Commissioner changed the regulations regarding the interpretations of medical evidence.  The amendments apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. <u>Revisions to Rule Regarding the Evaluation of Medical Evidence</u>, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017).  As such, the amendments do not apply here.

and was inconsistent with other evidence in the record.  The ALJ did not err in his treatment of the December 2016 opinions of Drs. Baginski and Crabtree.

Baxter also complains that the ALJ relied on the statement by Dr. Gold's nurse practitioner Arnold that Baxter was functionally intact.  Baxter correctly notes that the ALJ cited the wrong page in the record for this statement.  Regardless, Arnold made the observation.  Baxter argues that the ALJ erred by misreading the statement.  Baxter states, without citation to authority, that the phrase "functionally intact" meant that Baxter's back was not broken and his spine was not severed.  Baxter cites no authority for the proposition that this statement is a term of art with a specific meaning.  Even if true, any error was harmless in light of all the evidence. The ALJ's decision would not have changed had he adopted Baxter's definition for this term.  See McKinzey v. Astrue, 641 F.3d 884,  892 (7th Cir. 2011).

Baxter also argues that the ALJ abused his discretion by citing Dr. Gold's statement that from a neurosurgical standpoint Baxter could work if he was careful not to aggravate his back.  The Court sees no error.  Dr. Gold was Baxter's treating neurosurgeon.  He was an expert on diseases

of the spine and his observations were clearly relevant and material. The ALJ did not err in considering the statement.

Baxter complains that Dr. Gold's general statement that Baxter could work from a neurosurgical standpoint improperly invaded a decision reserved to the Commissioner. The Court sees no abuse of discretion. The ALJ considered the treating expert's observation in light of all the other evidence. The ALJ did not concede to Dr. Gold the power to decide the issue of disability. There was no error.

Finally, Baxter argues that the Commissioner erred in evaluating Baxter's evidence regarding the severity of his pain. The Court again disagrees. The ALJ did not reject Baxter's testimony and other statements regarding his pain because he did not have medical objective tests to prove the severity of his pain. Rather, the ALJ followed the regulations and guidance from the Social Security Administration to evaluate statements regarding the severity of symptoms, such as pain, in light of all the evidence in the record. See SSR 16-3p, 2017 WL 5180304, at *5-*8. Baxter testified that due to his symptoms, he could not sit or stand for more than 15 minutes, could not lift more than 10 pounds, and only drove once a week to go shopping. The ALJ found that the testimony was inconsistent with the objective medical record. The ALJ also found that the testimony

was inconsistent with Baxter's statements elsewhere that he could lift

medium weights, did "lots of swimming", drove every day to pick up his

children after school, and took care of a four-year old during the day.  The

ALJ properly relied on these inconsistencies in the record to give little

weight to Baxter's claims regarding the severity of his symptoms:

> [I]f an individual's statements about the intensity, persistence,
> and limiting effects of symptoms are inconsistent with the
> objective medical evidence and the other evidence, we will
> determine that the individual's symptoms are less likely to
> reduce his or her capacities to perform work-related activities . .
> . .

2017 WL 5180304, at *8.  The Court sees no error in the ALJ's

consideration of Baxter's evidence of the severity of his symptoms.

THEREFORE, THIS COURT RECOMMENDS that the Defendant

Commissioner's Motion for Summary Affirmance (d/e 14) should be

ALLOWED, Plaintiff Anthony Baxter's Brief in Support of Motion for

Summary Judgment (d/e 10) should be DENIED, and the decision of the

Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and

Recommendation must be filed in writing with the Clerk of the Court within

fourteen days after service of a copy of this Report and Recommendation.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely

objection will constitute a waiver of objections on appeal.  See Video

Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local

Rule 72.2.

ENTER:   November 17, 2020

_____s/ *Tom Schanzle-Haskins*_____

TOM SCHANZLE-HASKINS

UNITED STATES MAGISTRATE JUDGE